[ PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-10252

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 16, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-00080-CV-CAR-3


BARBARA J. HURLBERT,
Executor of the Estate of Thomas Hurlbert

Plaintiff-Appellant,

versus

ST. MARY'S HEALTH CARE SYSTEM, INC.,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(February 16, 2006)**

Before BIRCH, WILSON and COX, Circuit Judges.

WILSON, Circuit Judge:

Barbara J. Hurlbert, executor of the estate of Thomas Hurlbert, appeals the

district court's order granting summary judgment to Thomas Hurlbert's ("Hurlbert") former employer, St. Mary's Health Care System, Inc. ("St. Mary's"), on Hurlbert's claims under the Family and Medical Leave Act of 1993 ("FMLA" or the "Act").[1] The district court determined that Hurlbert could not establish statutory entitlement to FMLA leave, and that his FMLA interference and retaliation claims must therefore fail. With respect to Hurlbert's retaliation claim, the court further found Hurlbert had failed to present sufficient evidence that St. Mary's proffered reason for his termination was pretextual. We hold that the district court erred in construing pertinent regulatory language, and in assessing the evidence of pretext. As a result, we reverse and remand for further proceedings on both the interference and the retaliation claims.

## I. BACKGROUND

Hurlbert started working for St. Mary's in 1989, as a paramedic. In addition to fulfilling his duties at St. Mary's, Hurlbert worked full-time with the Rockdale County Fire Department ("Rockdale"). His duties at Rockdale included firefighting and dealing with hazardous materials, although he was also able to

---

[1] At oral argument, appellant's counsel stated that Hurlbert, the original Plaintiff in this action, had recently died in the line of duty while serving as a firefighter. For ease of reference, we will refer to Hurlbert in the present tense.

employ his paramedic skills as needed.

Shortly after being hired by St. Mary's, Hurlbert was promoted to a supervisory position that involved the maintenance of St. Mary's emergency medical services ("EMS") vehicles. Approximately five years later Hurlbert's duties changed, and he became responsible for supervising one of St. Mary's three emergency medical technician ("EMT") shifts. Among other things, Hurlbert was required to ensure that EMS units were adequately staffed during his shift, to visit and check on the various duty stations from which the units operated, and to transport linens.

Hurlbert suffered a heart attack in October of 1999. After he underwent a successful angioplasty and stent replacement, he was released by his cardiologist, Dr. Thomas Murphy, to return to work at St. Mary's on November 9th, and at Rockdale on November 16th. Prior to his release, Hurlbert was diagnosed with depression and anxiety, as well as sinusitis. Among the medications he was prescribed was Paxil, for anxiety and stress.[2] Hurlbert did return to full-time work, however, at both St. Mary's and Rockdale.

In February of 2002, St. Mary's underwent an internal reorganization. The oversight of EMS was transferred from vice-president Marilyn Hill to executive

_____

[2] It is uncontroverted that Hurlbert remained on Paxil up through the time he filed suit in August of 2003, and that his dosage was increased at one point.

director Bonnie Butler, who had been directing various other services at St. Mary's for eight years. After conducting a departmental review of EMS, Butler concluded that its director position should be replaced by that of a working manager. In July of 2002, Butler eliminated the position of EMS director held by Frank "Sparky" Wilson, and promoted Jeff Sosby to the new working manager position.[3]

As part of Butler's departmental review, she reassessed a number of unresolved patient complaints, including one about medical services rendered by Hurlbert to a five-year old child back in late February of 2002. Butler ultimately concluded that Hurlbert had falsified his account of events, and should have been terminated by Sparky Wilson. Given the age of the complaint, however, she issued Hurlbert a disciplinary letter instead of terminating him. Hurlbert, who denied engaging in any falsification, filed a grievance regarding the disciplinary action. During the early stages of the grievance process, Butler decided to have Hurlbert undergo a competency evaluation.[4]

Around that time Hurlbert also learned that his mother would have to undergo open heart surgery, and used several vacation days in early August to go visit her. On August 14th, the EMS medical director, Dr. Jerome Howell,

[3] Sosby, like Hurlbert, had been serving as one of the EMS shift supervisors.

[4] Butler testified in her deposition that she was concerned the father of the child with the seizure disorder might bring a lawsuit against St. Mary's or Hurlbert, and that she "felt like it was our responsibility to protect Tom [Hurlbert] by proving his competency."

4

administered a skills competency test to Hurlbert. Although each of the seven competency areas on the exam was pass/fail only, and Hurlbert passed five, Dr. Howell did not mark either "pass" or "fail" in two of the competency areas. Instead, Dr. Howell commented that Hurlbert (1) seemed "rusty" in his use of the Lifepak 10 and was not familiar with the use of the Lifepak 12, and (2) needed to review the use of drugs contained in the EMS "drug bag," as well as how those drugs are administered. Dr. Howell does not recall discussing the results of the examination with Butler, but did tell education director Mike McElhannon that Hurlbert needed to do some additional review. Hurlbert likewise recalls Dr. Howell telling him to brush up on the drug bag portion of the test.

On September 4th, Hurlbert received a hearing before an internal committee on his grievance. The committee upheld Butler's disciplinary action, but removed her reference to "falsification." Later that same day, Hurlbert met with Dr. Howell to complete the Lifepak and drug bag portions of Hurlbert's earlier competency exam.[5] Hurlbert remembers making a mistake in describing one drug, but claims Dr. Howell told him it didn't matter because St. Mary's was going to remove that drug from the drug box altogether. Hurlbert also contends that Dr. Howell never said that Hurlbert failed the test. Dr. Howell's recollection is that Hurlbert had

---

[5] Although Dr. Howell cannot recall whether he tested Hurlbert on the use of the Lifepak 10 and 12 at this meeting, Hurlbert does remember doing a Lifepak test.

5

clearly studied and was making his best effort, but had not necessarily established that he was prepared to perform the duties of his position. Dr. Howell was concerned about Hurlbert's ability to perform under stress, and suggested to Hurlbert that he might need to "tak[e] some time off or tak[e] a break or maybe, you know, stay[] off the truck and do[] something else for a while." Similarly, Hurlbert recalls discussing with Dr. Howell the increasing stress and exhaustion created by Hurlbert's heavy workload, the feeling of being singled out for discipline, and his mother's health. Hurlbert remembers stating that he needed to visit his mother, and didn't want to continue working as a paramedic until he had done so. According to Hurlbert, Dr. Howell advised him to relax and assured him that he (Howell) would help Hurlbert get some time off to visit his mom.

After finishing with Hurlbert, Dr. Howell went to speak with Mike McElhannon about Hurlbert's status. Howell explained to McElhannon (and Jeff Sosby, who also was present) that he (Howell) thought Hurlbert "was showing signs that his confidence in his own knowledge and experience was in doubt and I think under stress, he was wavering a little." Howell recalls stating that it would be helpful if Hurlbert could take on a more laid-back job, but denies ever saying that Hurlbert should not serve as a paramedic/EMT, or that Hurlbert should be terminated. At some point after Dr. Howell finished speaking with McElhannon

6

and Sosby, Hurlbert located Sosby and asked about taking leave:

> I indicated to him that I wanted to put in for a leave. And he told me he didn't know how to do that, that he was new at that job, which he had just been put into it [sic]. He wasn't really familiar with it and he didn't know if he had paperwork and all this other [sic]. And I says, "Well, okay. Well, I surely would appreciate it if you would make the arrangements because I would just like to take off and get out of here and . . . go see my mom."

Sosby replied that he would look into the matter, and later obtained a leave form for Hurlbert.

At some point between the end of Hurlbert's examination on September 4th and the morning of September 6th, Bonnie Butler met with Dr. Howell. According to Butler, Dr. Howell explained that Hurlbert had improved in his understanding of medications, but became confused about how to use them when given certain scenarios. Butler contends that Dr. Howell could not recommend putting Hurlbert "back on the truck." Dr. Howell did ask, however, whether there were other jobs within St. Mary's system that Hurlbert could perform, and Butler replied that she would check and see. It appears that Butler also met with St. Mary's vice president of human resources and support services, Jeff English, who testified in his deposition that Butler told him Dr. Howell "felt like it wasn't the right thing to do to put Tom [Hurlbert] back on the truck." According to English, Butler also discussed with him several options she had been thinking about regarding Hurlbert:

7

(1) try to help Hurlbert find a different job within St. Mary's system; (2) let Hurlbert resign and provide him thirty days' severance pay; or (3) terminate Hurlbert's employment. English acknowledged that leave was not discussed as an option in his conversation with Butler, but explained that he was not then aware of Hurlbert's desire to go on leave.

On September 6th, Hurlbert again met with Sosby in order to fill out leave-related paperwork. According to Hurlbert, Sosby initially agreed to help with the paperwork, but when Hurlbert returned to Sosby's office after leaving to use the restroom, Sosby informed him that plans had changed: Hurlbert could either resign and receive a month's severance pay, or be fired.[6] Hurlbert described his response as follows:

> "Mr. Sosby, my answer to that is I'm not going to resign. I absolutely refuse to resign. So I would think by default that I'm terminated, so I suppose my next step, which I'm fixing to go do, is go clock out and I'm going to go home. I don't intend to stay here for free."

When Hurlbert arrived at his home, however, he received a phone call from Bonnie Butler. According to Hurlbert, Butler stated that he wasn't fired and asked him to come to her office that afternoon. When Hurlbert arrived, Butler and another St.

---

[6] Sosby's account is somewhat different. He recalls stating to Hurlbert that Dr. Howell did not recommend that Hurlbert "go back on the truck," because Hurlbert "seemed to know his medications but when placed in a situation or under stress–or in a situation of how to use them or under any type of stress, then he would go in any direction . . . ." Hurlbert could resign and probably be placed in another hospital position that would be less stressful, or face probable termination.

8

Mary's employee named Karen were present. Butler explained that Hurlbert could no longer serve as a paramedic at St. Mary's, and Hurlbert then inquired about his leave:

> And I says, "Well, Ms. Butler, I have one question before we keep going on in this–discussing this anymore." I figured right then I was terminated, but I asked her also, I says, "What's important to me now," I says, "the leave isn't going to happen, is it?" And she says, "No, it's not." Talking about my medical leave that I requested [sic].

Hurlbert then stated that the meeting was over, the refusal of leave was illegal, and he would be speaking to his attorney.[7] Sosby, who was also present during the meeting, testified that after Hurlbert left, he (Sosby) probably told Butler that Hurlbert had requested FMLA leave and that Sosby had brought the paperwork with him.

On September 10th, Sosby received a letter from Hurlbert. The letter purported to be a "follow up" to Hurlbert's "request to take FMLA leave as was recommended by Dr. Howell last week." Hurlbert explained in the letter that he had been treated by his family physician, Dr. Samuel Griffin, and that Dr. Griffin agreed Hurlbert needed to take a 30 day leave of absence because of the mental

---

[7] Butler's account of the meeting is somewhat different. She testified that she gave Hurlbert the three options discussed earlier (find another job at St. Mary's, resign and receive severance, or be terminated), and that Hurlbert refused to seek another job or resign, and left. Butler disputes Hurlbert's claim that he asked about his leave. After Hurlbert left, Butler called Jeff English to inform him about what had happened. English recalls that he advised her to follow through with termination, because walking out on a meeting with superiors was "borderline insubordinate behavior."

stress Hurlbert was under and its impact on his health. Hurlbert attached a note from Dr. Griffin, dated September 9, 2002, which indicated that Hurlbert was under Dr. Griffin's treatment and could return to work on October 9, 2002. In the letter Hurlbert also expressed his understanding that leave papers had been sent to Sosby for Hurlbert to complete, but that Hurlbert's meeting with Butler "prevented these papers from being completed and submitted." Hurlbert asked if he needed to complete any paperwork "to formally request leave," and requested that his accrued paid sick and vacation leave be applied during the 30 day period.

Although Sosby and Butler discussed Hurlbert's letter, Butler advised that St. Mary's could not grant leave after Hurlbert had been terminated.[8] A corrective counseling action form dated September 6, 2002, which was stamped received by human resources on September 9th, appears to have been signed by Butler, Sosby, and one Karen Joyce. The form states that Hurlbert was discharged due to his "inability to pass the competency review." Butler's name also appears on a personnel action request form ("PAR") dated September 6th. Although the PAR indicates that Hurlbert was terminated, and that termination requires the completion of certain additional sections on the form (including the reason for termination), these sections are blank. According to Jeff English, the issuance of

---

[8] Like Butler, Sosby testified that he understood Hurlbert to have been terminated due to what transpired in Hurlbert's meeting with Butler, Sosby, and Karen.

10

corrective counseling action form and PAR formalize the termination process, and

human resources will typically prepare a separation notice within a day or two of

receiving the PAR. Although Hurlbert's PAR is stamped received by human

resources on September 9th, his separation notice was not issued until September

18th, though it was backdated to September 6th.[9] The notice identifies the reason

for Hurlbert's separation as "[f]ailure to meet competency requirements."

Approximately 11 months after receiving his separation notice, Hurlbert

filed suit against St. Mary's under the FMLA, pleading for damages and

declaratory and injunctive relief. Hurlbert alleges that St. Mary's terminated him

following his request for leave, thus interfering with Hurlbert's right to take FMLA

leave and retaliating against him in violation of the FMLA.

The district court granted St. Mary's motion for summary judgment on both

claims. Although the court found genuine issues of fact on whether Hurlbert had

requested FMLA leave before or after termination, the court determined that

Hurlbert could not establish statutory entitlement to the leave because: (1) the

stress suffered by Hurlbert was not a "serious health condition" under the statute;

(2) Hurlbert could not link the stress to the period of incapacity caused by his heart

---

[9] On September 12th, Hurlbert's attorney sent a letter to Butler indicating that Hurlbert had not received any written notice of termination, and requesting the reasons for termination if Hurlbert had in fact been terminated. Butler testified that she received this letter, but did not remember when she received it.

11

attack in 1999; and (3) Hurlbert could not rely on his mother's health condition because he had not raised it in his complaint. Without statutory eligibility for leave, the court concluded, Hurlbert's interference claim must fail. Hurlbert's retaliation claim likewise failed, the district court determined, because Hurlbert "could not have availed himself of FMLA rights that he did not possess." Even if Hurlbert could bring a retaliation claim, the court added, Hurlbert's only evidence of pretext was his own subjective belief about the basis for his termination, which is insufficient to survive summary judgment. Hurlbert appeals both determinations.

## II. STANDARD OF REVIEW

"We review the district court's grant of summary judgment de novo, applying the same legal standards that bound the district court, and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party." *Cruz v. Publix Super Mkts., Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005) (internal quotes and emphasis omitted). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## III. DISCUSSION

The FMLA grants an eligible employee the right to take up to 12 workweeks of unpaid leave annually for any one or more of several reasons, including "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The Act creates a private right of action to seek equitable relief and money damages against employers who "interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA rights. 29 U.S.C. §§ 2615(a)(1), 2617(a); *see Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 724-25, 123 S. Ct. 1972, 1976, 155 L. Ed. 2d 953 (2003). We have recognized that § 2615(a) creates two types of claims: "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Strickland v. Water Works and Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (internal citations omitted).

A.    *Interference Claim*

To establish an interference claim, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Id.* at 1207. The employee need not allege that his employer intended to deny the

13

benefit–"the employer's motives are irrelevant." *Id.* at 1208. Hurlbert contends

the district court erred in determining that he did not suffer from a "serious health

condition," and thus was not entitled to FMLA leave. As defined in the FMLA,

"serious health condition" means "an illness, injury, impairment, or physical or

mental condition that involves– (A) inpatient care in a hospital, hospice, or

residential medical care facility; or (B) continuing treatment by a health care

provider." 29 U.S.C. § 2611(11). Hurlbert points to the fact that he was diagnosed

with anxiety following his 1999 heart attack as evidence of a mental condition

involving "continuing treatment by a health care provider." We must consider this

argument not only under the language of the statute, but also under pertinent

regulations promulgated by the Department of Labor:

> (a) For purposes of FMLA, "serious health condition" entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves:
>
> . . . .
>
> (2) *Continuing treatment* by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
>
> (i) A period of *incapacity* (*i.e.*, inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> (A) Treatment two or more times by a health care provider, by a nurse

14

or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider; or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114; *see Russell v. North Broward Hosp.*, 346 F.3d 1335, 1342 (11th Cir. 2003).[10]

Hurlbert argues that he meets the requirements of § 825.114(a)(2)(i), because his October 1999 heart attack resulted in a period of incapacity exceeding three calendar days, and his subsequent treatment for anxiety "related to" that condition and involved a regimen of continuing treatment, i.e., a Paxil prescription.[11]  The district court found this argument unpersuasive, because it found "no evidence that Hurlbert's heart attack and that period of incapacity almost three years prior was sufficiently related to the events at issue."  We agree, in that Hurlbert's argument tends to conflate his heart attack and his anxiety.  Section 825.114(a)(2)(i) refers to a "period of incapacity . . . due to the serious health

---

[10] Congress authorized the Secretary of Labor to promulgate regulations "necessary to carry out" the FMLA, 29 U.S.C. § 2654, and "[t]he Secretary's judgment that a particular regulation fits within this statutory constraint must be given considerable weight."  *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86, 122 S. Ct. 1155, 1160, 152 L. Ed. 2d 167 (2002).  Here, there is no claim that any applicable regulations promulgated by the Secretary are "arbitrary, capricious, or manifestly contrary to the statute."  *Id.* (internal quotations omitted).

[11] As the district court correctly acknowledged, a regimen of continuing treatment under § 825.114(a)(2)(i)(B) includes "a course of prescription medication."  29 C.F.R. § 825.114(b).

15

condition . . . and any subsequent treatment or period of incapacity relating to the same condition . . . ." (emphasis omitted). Although Hurlbert was incapacitated by his heart attack, the summary judgment evidence is not that Hurlbert was prescribed Paxil for his heart attack, but rather for anxiety, with which he was separately diagnosed before returning to work. Thus, we are not persuaded that any treatment for or period of incapacity caused by Hurlbert's anxiety "relates to" his heart attack for purposes of § 825.114(a)(2)(i).

Even if this is so, Hurlbert argues, he still meets the conditions described in § 825.114(a)(2)(i), because his anxiety was itself the cause of a period of incapacity–the thirty day period described in Hurlbert's September 10th letter (which stated that he needed a thirty day leave of absence due to mental stress) and evidenced by Dr. Griffin's note. The district court rejected this argument on the grounds that Hurlbert was not "incapacitated" within the meaning of § 825.114, because Hurlbert had continued to work at Rockdale during the thirty day period in question. In reaching this conclusion, the district court held that Hurlbert's showing of incapacity "must be made in accordance with the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq., and the regulations at 29 C.F.R. § 1630.2(n), 29 C.F.R. § 825.115." Under these provisions, the court reasoned, one must show that he is substantially limited or significantly restricted in the ability to perform either a class of jobs, or a broad range of jobs in various

16

classes, as compared to an average person with comparable training, skills, and abilities. While Hurlbert may not have been able to work as a paramedic at St. Mary's, the court explained, his work at Rockdale was sufficiently similar to preclude him from establishing the requisite period of incapacity.

The district court erred when it conducted an incapacity analysis under the ADA and corresponding regulations. Section 825.115 does refer to the ADA and 29 C.F.R. § 1630.2(n) as relevant for purposes of determining whether an employee is "unable to perform the functions of the position of the employee" under 29 U.S.C. § 2612(a)(1)(D), but that statutory inquiry is distinct from the inquiry into whether an employee has a "serious health condition," which is where the term "incapacity" comes into play. *See, e.g.*, *Stekloff v. St. John's Mercy Health Sys.*, 218 F.3d 858, 860-62 (8th Cir. 2000). As the Eighth Circuit pointed out in *Stekloff*, there may be some parallels between the ADA and FMLA, but applicable regulations explicitly state that "ADA's 'disability' and [the] FMLA's 'serious health condition' are different concepts, and must be analyzed separately." *Id.* at 861 (quoting 29 C.F.R. § 825.702(b)).

The definition of "incapacity" is set out in § 825.114: "A serious health condition . . . includes . . . [a] period of *incapacity* (*i.e.*, inability to work, attend school or perform other regular daily activities due to the serious health condition,

17

treatment therefor, or recovery therefrom) . . . ." 29 C.F.R. § 825.114(a)(2).[12]  For

the reasons stated above, however, we decline to identify the meaning of "inability

to work" with the ADA inquiry into whether a person is unable to perform the

"major life activity of working," 29 C.F.R. § 1630.2(j)(3).  Instead, we agree with

the analysis of the Eighth Circuit in *Stekloff*:

> Upon consideration of the declared purposes of the FMLA and its legislative history, we hold that a demonstration that an employee is unable to work in his or her *current job* due to a serious health condition is enough to show that the employee is incapacitated, *even if that job is the only one the employee is unable to perform*."

218 F.3d at 861 (emphasis added).  *But cf.* 29 C.F.R. § 1630.2(j)(3)(i) (explaining

that under the ADA "[t]he inability to perform a single, particular job does not

constitute a substantial limitation in the major life activity of working").  We

therefore reject St. Mary's claim that, as a matter of law, Hurlbert could not have

experienced an "inability to work" (in his position at St. Mary's) within the

meaning of § 825.114(a)(2)(i) when he continued to perform similar duties for

Rockdale.[13]

St. Mary's argues that summary judgment was nevertheless appropriate,

because Hurlbert presented no medical evidence of an inability to work for three

---

[12] The foregoing language also appears as part of the definition of "continuing treatment" in 29 C.F.R. § 825.800, which contains various definitions applicable to Part 825 of Title 29.

[13] We further note that there is a genuine issue of fact as to the degree of similarity, if any, between Hurlbert's job at St. Mary's and his job at Rockdale.

18

days or more, or an inability to "perform the functions of his position."[14]  Having

reviewed the record in the light most favorable to Hurlbert, including the testimony

of Dr. Howell and Hurlbert's note from Dr. Griffin, we find that there are genuine

issues of fact precluding summary judgment for St. Mary's on these grounds.  We

must therefore reverse the district court's grant of summary judgment on

Hurlbert's interference claim and remand it for further proceedings.

In addition to the theories discussed above, Hurlbert asserted two other

arguments in support of his interference claim.  One was that he could satisfy

§ 825.114(a)(2)(iii), because his anxiety amounted to a "chronic serious health

condition" described therein.[15]  Like Hurlbert's claim under § 825.114(a)(2)(i), the

---

[14] Title 29 C.F.R. § 825.115 states in relevant part:

An employee is "unable to perform the functions of the position" where the health care provider finds that the employee is unable to work at all or is unable to perform any one of the essential functions of the employee's position within the meaning of the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, and the regulations at 29 CFR § 1630.2(n).

[15] A serious health condition involving continuing treatment by a health care provider may include:

(iii) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition.  A chronic serious health condition is one which:

(A) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

(B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

(C)  May cause episodic rather than a continuing period of incapacity (*e.g.*, asthma, diabetes, epilepsy, *etc.*).

19

district court found this argument unavailing because a chronic serious health condition requires a "period of incapacity" and, under the district court's interpretation of the applicable regulations, Hurlbert's work at Rockdale precluded such a finding. As we disagree with that aspect of the district court's interpretation, and as St. Mary's has presented no further argument (other than those already discussed above) on why § 825.114(a)(2)(iii) could not apply, Hurlbert is free to reassert this theory on remand. However, the district court correctly rejected Hurlbert's final argument–that he was entitled to FMLA leave in order to care for his mother, who was recovering from heart surgery.

The FMLA authorizes leave "[i]n order to care for the . . . parent, of the employee, if such . . . parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). Hurlbert's complaint, however, provided no notice whatsoever that he believed he was entitled to leave on this basis. Indeed, the only person in the complaint alleged to have a experienced a serious health condition is Hurlbert. We have previously held that Rule 8(a)'s liberal pleading standard is inapplicable once discovery has commenced, and that "[a]t the summary judgment stage, the

---

29 C.F.R. § 825.114(a)(2)(iii). The regulations further note that absences attributable to incapacity under paragraph (iii) "qualify for FMLA leave even though the employee . . . does not receive treatment from a health care provider during the absence, and even if the absence does not last more than three days." *Id.* at § 825.114(e).

proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam). Hurlbert argues that this rule is inapplicable, because his allegations about his mother do not raise a new "claim," and are merely additional facts asserted in support of the interference claim already pled in his complaint. We disagree. The sole basis for entitlement to FMLA leave pled in Hurlbert's interference claim was *his* alleged serious health condition. *See* 29 U.S.C. § 2612(a)(1)(D). Thus, the subsequent assertion of an additional, separate statutory basis for entitlement to leave (caring for a *parent's* serious health condition) effects a fundamental change in the nature of Hurlbert's interference claim. *See id.* at § 2612(a)(1)(C). Having proceeded through discovery without amending (or seeking to amend) his complaint to reflect that fundamental change, Hurlbert was not entitled to raise it in the midst of summary judgment. *See Gilmour*, 381 F.3d at 1315 ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment.").

B.     *Retaliation Claim*

Where, as here, a plaintiff alleges an FMLA retaliation claim without direct evidence of the employer's retaliatory intent, we apply the burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Strickland*, 239

21

F.3d at 1207. To establish a prima facie case of retaliation, the plaintiff must show that: (1) he engaged in statutorily protected activity; (2) he experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *See id.*; *Smith v. BellSouth Telecomms., Inc.*, 273 F.3d 1303, 1314 (11th Cir. 2001). If the plaintiff makes out a prima facie case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action. *Smith*, 273 F.3d at 1314. If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual. *Id.*

The district court held that Hurlbert's retaliation claim failed based on the court's determination that Hurlbert failed to establish he was entitled to FMLA leave in the first place.[16] We cannot agree with this reasoning, because we determined above that Hurlbert did raise genuine issues of material fact on whether he was entitled to leave. By doing so, Hurlbert likewise raised genuine issues of material fact on whether he engaged in statutorily protected activity under the FMLA–and St. Mary's does not argue that he failed to establish or raise a genuine issue of material fact on the second and third elements of his prima facie case.

---

[16] We have held that one cannot bring an FMLA retaliation claim based on "an attempt to exercise a right that is not provided by [the] FMLA," such as "the right to leave before one becomes eligible therefor." *Walker v. Elmore County Bd. of Educ.*, 379 F.3d 1249, 1253 (11th Cir. 2004). We do not address whether this principle would apply to the instant case, because we have determined that Hurlbert raised genuine issues of material fact on whether he was entitled to FMLA leave.

22

Hurlbert's termination is certainly an adverse employment action, and the facts, when read in the light most favorable to Hurlbert, indicate that his termination occurred within days of his request for leave. Close temporal proximity between protected conduct and an adverse employment action is generally "sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Brungart v. Bellsouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). An exception to this rule applies where there is "unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct," *id.*, but genuine issues of material fact preclude the application of this exception to the instant case. The summary judgment evidence, when considered in the light most favorable to Hurlbert, suggests that Jeff Sosby, Bonnie Butler, and Jeff English were all involved in the decision to terminate Hurlbert. It appears that by September 4th, Sosby was aware of Hurlbert's desire to take leave–and that Sosby was also present on September 6th when Hurlbert claims to have again raised the issue of leave in his meeting with Butler, who then conferred with Sosby and contacted English. Although St. Mary's claims that Hurlbert was terminated no later than September 6th, a number of irregularities in the termination process call this claim into question. *See infra*. Thus, a jury could reasonably infer that the person who decided to terminate Hurlbert (or who made a critical recommendation on the issue) had prior knowledge of his request for leave.

The district court, however, also found that Hurlbert had failed to present evidence of pretext sufficient to rebut St. Mary's proffered reasons for his termination. St. Mary's reasons, as outlined by the district court, were Hurlbert's disciplinary status, unacceptable job performance, and the results of his two skills evaluations. In response to these, the court found, Hurlbert had presented nothing more than "his own explanations of his job performance and why [St. Mary's] decisions were unfair to [him] under those circumstances." We disagree, and hold that Hurlbert did present evidence of pretext sufficient to preclude summary judgment.

To show pretext, a plaintiff must "'come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)). The close temporal proximity between Hurlbert's request for leave and his termination–no more than two weeks, under the broadest reading of the facts–is evidence of pretext, though probably insufficient to establish pretext by itself. *See Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (holding that three and one-half month period between employee's protected activity and her termination was,

24

standing alone, insufficient to establish pretext). Hurlbert's evidence of temporal proximity, however, does not stand alone.

We have recognized that an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext. *See id.* at 1245-46; *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601-02 (11th Cir. 1986). Here, the corrective counseling statement and separation notice documenting Hurlbert's termination make no reference to his disciplinary status or job performance, and identify the sole reason for his termination as an "inability to pass the competency review" or "[f]ailure to meet competency requirements." Furthermore, Jeff English testified that he advised Butler to follow through with termination because of Hurlbert's "borderline insubordinate behavior" in walking out of the September 6th meeting with her, yet no charge of insubordination appears in the foregoing termination documents.

Similarly, an employer's deviation from its own standard procedures may serve as evidence of pretext. *See Bass v. Bd. of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1108 (11th Cir. 2001) (stating that employer's violation of its own hiring procedure could be evidence of pretext); *accord Rudin v. Lincoln Land Community Coll*, 420 F.3d 712, 727 (7th Cir. 2005) ("An employer's failure to follow its own internal employment procedures can constitute evidence of pretext."). Here, English indicated that St. Mary's usually prepares separation

25

notices within a day or two of termination, but Hurlbert's separation notice was not issued until September 18th–twelve days after St. Mary's claims he was terminated, and six days after his attorney sent Butler a letter demanding to know the basis for Hurlbert's termination.[17]

Such inconsistencies are inconsequential, St. Mary's argues, because the decision to terminate Hurlbert had been set in motion before Butler learned of Hurlbert's request for FMLA leave. When read in the light most favorable to Hurlbert, however, the summary judgment evidence indicates that there is at least a genuine issue of material fact on this point. Furthermore, although St. Mary's notes that Butler first ordered Hurlbert to submit to a skills evaluation back in August of 2002 (well before Hurlbert claims to have requested leave), this does not demonstrate that the decision to terminate him was itself made before the request for leave, or that termination would have occurred regardless of the request. Hurlbert presented evidence of pretext sufficient to preclude summary judgment on his retaliation claim.

## IV. CONCLUSION

We hold that the district court erred in determining that Hurlbert failed to

---

[17] In addition, the PAR accompanying Hurlbert's final corrective counseling statement is incomplete on its face–the reasons for Hurlbert's termination were not listed as required by the directions on the form itself.

26

raise a genuine issue of material fact on whether he suffered from a "serious health condition," as defined by the FMLA and applicable regulations. We further hold that the district court erred in determining that Hurlbert failed to present evidence of pretext sufficient to preclude summary judgment on his retaliation claim. Accordingly, the district court's order granting summary judgment on Hurlbert's interference and retaliation claims is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.