[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-15716
Non-Argument Calendar
_____

D.C. Docket No. 4:15-cv-10007-JLK

JILL DIAMOND,

Plaintiff-Appellant,

versus

HOSPICE OF FLORIDA KEYS, INC.,
d.b.a. Visiting Nurse Association of The Florida Keys,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 27, 2017)

Before JORDAN, ROSENBAUM, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Jill Diamond worked for Hospice of Florida Keys, Inc., d/b/a Visiting Nurse Association of the Florida Keys, ("Hospice") as a licensed clinical social worker. Over the course of her employment, she took intermittent leave under the Family and Medical Leave Act ("FMLA") to care for her parents, who had serious health conditions. In March and April 2014, Diamond took unforeseeable FMLA leave for a total of nearly two weeks in order to care for her mother. Hospice notified her in early April that her continued absences were affecting her job performance and then, in early May, terminated her employment. Diamond filed this lawsuit alleging that Hospice interfered with her FMLA rights and fired her in retaliation for taking FMLA-protected leave. The district court granted summary judgment to Hospice. Because we find genuine disputes of material fact as to whether Hospice violated Diamond's rights under the FMLA, we vacate and remand.

## I.

Hospice provides at-home healthcare services for residents and visitors of Monroe County, Florida, who have been diagnosed with serious or terminal illnesses. Diamond began working for Hospice full-time as a social worker in November 2011. In that role, Diamond was responsible for drafting care plans for patients, coordinating care plans with the Inter-Disciplinary Team, preparing financial and psychosocial assessments of patients and families, implementing bereavement programs for survivors of patients, and coordinating volunteer

2

services.   Hospice employed two other social workers in part-time capacities. Diamond's direct supervisor was Judie Klitenick.

Beginning in June 2013, Diamond began taking intermittent FMLA leave in order to care for her elderly parents, who suffered from serious health conditions. Hospice approved Diamond's requests for FMLA leave on various dates between June 2013 and February 2014.

Hospice required employees to take earned personal time off ("PTO") hours concurrently with FMLA leave.[1]   When Diamond returned from her intermittent FMLA leave, she frequently received written notices from Hospice warning her that her PTO balance was low and that exhaustion of PTO, along with absences, could adversely affect her job and benefits.   The notices did not address FMLA leave at all.   According to Hospice, its standard practice was to notify employees whenever their PTO balances dropped below sixteen hours, whether they had taken FMLA leave or not.   Hospice discontinued issuing these notices for employees taking FMLA leave concurrent with PTO leave at some point in or after January 2014.   Michelle Chennault, the Human Resources ("HR") Manager at the time her deposition was taken, acknowledged at her deposition that an employee who received such a notice could be discouraged from taking FMLA leave.

---

[1] Employers are permitted to do so under the FMLA.   29 C.F.R. § 825.207(a) ("[T]he employer may require the employee to substitute accrued paid leave for unpaid FMLA leave. The term substitute means that the paid leave provided by the employer, and accrued pursuant to established policies of the employer, will run concurrently with the unpaid FMLA leave").   Of course, the employee is still entitled to take unpaid FMLA leave even if she has no paid leave.

3

On March 20, 2014, Diamond learned that her mother was seriously ill. That same day, she signed and submitted an FMLA leave request to HR for the dates of March 21 (Friday) and March 24 (Monday). Her leave request was approved on March 21 by HR Manager Dee Eudy and Clinical Director Elizabeth Allatta. The request was returned to Diamond after approval.

While Diamond was out, Eudy sent her a memorandum requesting an updated medical certification from a health-care provider to show that her parent had an FMLA-qualifying health condition.[2] In addition, the management of HR changed while Diamond was on leave. It appears that on March 24, Chennault took over the duties of HR Manager from Eudy.[3]

Diamond returned to work on March 26. On that date, the CEO of Hospice, Jody Gross, warned Diamond that if she worked for any other company, she would be out of a job. Then, on March 28, Chennault sent Diamond a memo requesting "documentation to support your unscheduled leave beginning on Friday, March 21, 2014." In the memo, Chennault requested, in addition to an updated certification, other documentation "to support the need of intermittent use of FMLA when a 30

---

[2] "An employer may require that an employee's leave to care for the employee's covered family member with a serious health condition, or due to the employee's own serious health condition that makes the employee unable to perform one or more of the essential functions of the employee's position, be supported by a certification issued by the health care provider of the employee or the employee's family member." 29 C.F.R. § 825.305(a).

[3] Chennault was hired as an executive assistant to CEO Jody Gross. She formally became HR Manager in August 2014, but it appears to be undisputed that she was performing the duties of HR Manager as of March 24, 2014.

day advance notice is not provided," such as travel receipts or health-care provider receipts.  Chennault also noted that similar supporting documentation would be required whenever Diamond took FMLA leave with less than 30 days' advance notice.  Diamond had never before been asked to provide travel receipts or similar documentation.

Hospice maintains that it believed that Diamond, despite the leave request she submitted to HR on March 20, was a "no call, no show" on March 21, 24, and 25.[4]  Hospice connects its request for supporting documentation to that belief. Diamond counters that at no point did anyone at Hospice indicate to her that she was a "no call, no show" on those dates.  Also, according to Diamond, she spoke by phone with her supervisor, Klitenick, on March 24 about patient issues, and Klitenick did not indicate that Diamond was absent without notice.

While the parties argue this factual dispute at some length, we find that it is not material to the issues before us.  According to Chennault's March 28 memo, Hospice knew that Diamond's leave on March 21, 24, and 25 was potentially FMLA-qualifying, and the request for "supporting documentation" was based on a lack of 30 days' advance notice, not whether Diamond had been a "no call, no show."  Chennault's memo indicates that Hospice policy was to request supporting

---

[4] More precisely, Hospice maintains that Chennault and Gross were unaware of the approved leave request and, curiously, attempts to blame Diamond for that lack of awareness, suggesting that she should have recognized that HR failed to follow its own practices by returning the leave request to her after approval by the HR Manager and her supervisor.

documentation for any FMLA leave taken with less than 30 days' notice. Chennault's later emails likewise connect the need for supporting documentation to the fact that Diamond took unforeseeable FMLA leave—that is, leave with less than 30 days' notice. So, drawing all reasonable inferences in Diamond's favor, Hospice would have requested supporting documentation in the same manner even if Diamond had informed Hospice of her need for leave at the earliest opportunity, which was March 20, one day before she took leave.

Diamond's mother was hospitalized on Friday, March 28, 2014. The following Monday, March 31, Diamond signed and submitted two requests for FMLA leave to care for her parents. The first request covered April 2–4 and 7–8 (April 5–6 was the weekend). The second request covered April 14–18.

Diamond was absent from work on April 2–4 and 7. She returned to work on April 8, one day early. At 10:20 a.m. on April 8, Diamond emailed Chennault voicing concern about Hospice's requests for documentation because, on the day she left to care for her mother, April 2, Chennault had told her that Hospice "needed receipts to verify where [she] said [she] would be." Diamond explained that she had turned in both a medical certification from her mother's doctor stating the reasons her mother needed care and a note from the same doctor stating that she accompanied her mother to an appointment on April 7. Diamond asked for clarification of what receipts in particular Chennault was seeking.

6

At 11:35 a.m. on April 8, Chennault responded that Hospice was requesting "proof of need," which "can include food receipts in the city where your parents reside, anything from the hospital with dates you were out (discharge papers), [or] any receipts for lodging, food or gas in the vicinity of your parent's home." The doctor's note was sufficient proof for April 7, Chennault stated, but documentation "for other days taken [is] necessary." Further, Chennault wrote,

> ***Your continued unpaid time away from the workplace compromises the quality of care we are able to provide as an organization.*** We understand that family emergencies arise and time away is occasionally necessary. FMLA is designed to help you with that, but there are requirements for approval of FMLA without notice. The documentation we have requested to certify your time away starting March 21, 2014 is necessary. Please provide documentation for previous days in which FMLA was requested without 30 days' notice in March 2014 up to April 7, 2014 before close of business Friday, April 11, 2014.

Doc. 10-3 at 16 (emphasis added).

At 11:47 a.m. on April 10, Diamond emailed Chennault requesting, among other things, "the document reflecting the distinction the HR Department makes between documents needed before and after 30 days from the time FMLA time is established." She could find no such distinction in the FMLA paperwork she received from Chennault. After listing the receipts and other documents she had provided to Hospice, she asked that Hospice not place "undue pressure on [her] to provide documentation above and beyond FMLA requirements." In addition, she emphasized that she was trying to minimize any "negative impact" her leave might

7

have on patient care by "traveling 300 miles each way to [her] parents' home" "despite the care recommended by [her] mother's MD for the entire month of April." Finally, Diamond disputed that her leave was negatively affecting her work and asked how her absences were "compromising the quality of care this agency provides."

At 1:36 p.m. on April 10, Chennault emailed Diamond stating that her absences on March 21, 24, and 25, and on April 2–4, and 7, would be coded as FMLA leave based on the documentation she provided. She began this email by stating, "Let me be clear, we are not in any way attempting to deny your request for FMLA."

Chennault approved Diamond's two March 31 leave requests on April 11. On that same date, Chennault advised Diamond that she might want to conserve her remaining FMLA leave, which was running low. Diamond stated that, due to this warning and other comments, she decided to forgo taking her approved leave on April 14 after learning that she also needed to care for her mother on April 21.

In an email on April 30, Chennault responded to Diamond's request for clarification of how her absences were harming patient care. Chennault wrote,

> As for quality of care suffering: repeated instances of care plans not being updated on a timely basis and an instance of a patient . . . without a care plan have been documented. Time sheets with visits are not being completed in a timely manner as determined by your supervisor. The bereavement group (a responsibility in your job description) had to be coordinated and facilitated by the social work

8

supervisor.  ***These are documents examples of "quality of care" suffering due to repeated "emergent" leaves of absence.***

Doc. 18-4 at 10 (emphasis added).

Five days after Chennault's April 30 email, Hospice terminated Diamond's employment.  Hospice provided Diamond a termination memorandum, written by Chennault, which reflected that Diamond was being terminated primarily for reasons of poor job performance.  The performance deficiencies listed in Chennault's April 30 email also appear in the termination memo, such as the failure to timely complete care plans and visit notes and the failure to set up the bereavement support group.  The termination memo also notes, among other "Facts Regarding Termination," that Diamond did not update her care-plan notes on April 29 before leaving for the day, and that, on the same day, she left the building during a state survey without authorization.

## II.

In November 2014, Diamond filed her complaint in Florida state court, alleging that Hospice interfered with her FMLA rights and retaliated against her for taking FMLA-protected leave.  Hospice timely removed the complaint to the United States District Court for the Southern District of Florida and later filed a motion for summary judgment, to which Diamond responded.  After holding a hearing on Hospice's motion for summary judgment, the district court entered an order granting summary judgment to Hospice on both of Diamond's claims.  The

9

court concluded that Diamond's interference claim failed because she did not show prejudice as a result of any interference, and that her retaliation claim failed because she did not establish that Hospice's reasons for her termination were pretextual.  This appeal followed.

## III.

We review a district court's grant of summary judgment *de novo*, viewing the evidence and drawing all reasonable inferences in favor of the non-moving party.  *Martin v. Brevard Cty. Pub. Schs.*, 543 F.3d 1261, 1265 (11th Cir. 2008).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## IV.

Among other purposes, Congress enacted the FMLA "to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity."  29 U.S.C. § 2601(b)(1).  To that end, the FMLA entitles eligible employees to take up to twelve weeks of leave in one year for various specified reasons, including the "serious health condition" of the employee's parent.  29

U.S.C. § 2612(a)(1)(C); *see Smith v. BellSouth Telecomms., Inc.*, 273 F.3d 1303, 1305 (11th Cir. 2001). Such leave generally may be taken intermittently—that is, "in separate blocks of time due to a single qualifying reason." *See* 29 U.S.C. § 2612(b)(1); 29 C.F.R. § 825.202(a).[5]

The FMLA makes it unlawful for employers "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). We have recognized that the FMLA prohibits employers both from interfering with employees' rights under the FMLA (interference claims) and from retaliating against employees for exercising their rights under the FMLA (retaliation claims). *See Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001); 29 C.F.R. § 825.220(c) (stating that the FMLA "prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights").

## A.    *Interference Claim*

"To prove FMLA interference, an employee must demonstrate that [she] was denied a benefit to which [she] was entitled under the FMLA." *Martin*, 543 F.3d

---

[5] Congress authorized the Secretary of Labor to promulgate regulations "necessary to carry out" the FMLA, 29 U.S.C. § 2654, and "[t]he Secretary's judgment that a particular regulation fits within this statutory constraint must be given considerable weight." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002). Here, there is no claim that any applicable regulations promulgated by the Secretary are "arbitrary, capricious, or manifestly contrary to the statute." *Id.* (internal quotations omitted).

at 1267. Benefits under the FMLA include both taking leave and being reinstated following a leave period, subject to certain conditions. *See id.* With respect to an employee's right to take FMLA leave, unlawful employer interference includes not only refusing to authorize FMLA leave, but also "discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). The intent of the employer is not relevant to an FMLA interference claim. *Martin*, 543 F.3d at 1267.

In addition to showing interference, a plaintiff must show that she has been prejudiced by the FMLA violation in some way. *Evans v. Book-A-Million*, 762 F.3d 1288, 1296 (11th Cir. 2014) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). That means that a plaintiff must "demonstrate some harm remediable by either 'damages' or 'equitable relief,'" the two distinct categories of remedies provided for by the FMLA. *Id.*; *see* 29 U.S.C. § 2617(a)(1). Damages can include not only "wages, salary, employment benefits, or other compensation denied or lost to [an] employee by reason of the violation," but also, in cases where those forms of compensation have not been denied or lost, "any actual monetary losses sustained by the employee as a direct result of the violation." 29 U.S.C. § 2617(a)(1)(A)(i). Equitable relief can include "employment, reinstatement, and promotion." *Id.* § 2617(a)(1)(B).

Here, Diamond has produced sufficient evidence for a reasonable jury to conclude that Hospice interfered with her FMLA rights by discouraging her from

12

taking FMLA leave in order to care for her seriously ill parents. *See* 29 C.F.R. § 825.220(b). The clearest example of such discouragement is Chennault's April 8 email to Diamond, which stated, "Your continued unpaid time away from the workplace compromises the quality of care we are able to provide as an organization." A reasonable jury could interpret this statement as a warning that taking additional FMLA leave could put Diamond's job in jeopardy.

Hospice has maintained throughout this case that Chennault's April emails to Diamond, in which Chennault made negative comments about Diamond's continued unpaid absences from work, related solely to the March absences and were based on Hospice's belief that Diamond was a "no call, no show" for those dates. But even assuming that inference is a reasonable one, which is doubtful, it is not the only reasonable inference that may be drawn, nor is it the one most favorable to Diamond. *See Martin*, 543 F.3d at 1265.

Chennault's April 8 email, by its terms, sweeps more broadly than just the March absences. In the email, Chennault expressly asks for "proof of need" "for previous dates in which FMLA was requested without 30 days' notice in March 2014 up to April 7, 2014," which, of course, includes Diamond's absences on April 2–4 and 7. That Chennault meant to include April 2–4 and 7 in her request is further shown by her statement that the April 7 doctor's note was adequate documentation for that date, but documentation "for other days taken" was

13

necessary. Moreover, when Chennault sent the April 8 email, Diamond had just returned from a four-day absence, she had a pending leave request for April 14–18, and her previous requests for FMLA leave had not yet been approved. In this context, the phrase "*continued* unpaid time away from the workplace" more naturally refers to all of Diamond's unpaid leave then under discussion or before Chennault for approval.

In addition, the record includes other evidence of discouragement, including, most notably, Hospice's requests for "proof of need" in the form of gas and travel receipts. Regarding proof of need, the FMLA allows an employer to "require that an employee's leave to care for the employee's covered family member with a serious health condition . . . be supported by a certification issued by the health care provider of the employee or the employee's family member." 29 C.F.R. § 825.305(a); *see* 29 U.S.C. § 2613(a). Moreover, when an employee takes unforeseeable FMLA leave (less than 30 days' notice), the employee must notify the employer as soon as practicable in compliance "with the employer's usual and customary notice and procedural requirements for requesting leave," and the employee must "respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying." 29 C.F.R. § 825.303(a)–(b).

Here, though, Hospice asked for documentation in addition to the medical certification. And the kinds of documentation Hospice requested have no

14

necessary relation to Diamond's need for leave or, assuming Hospice had some reason to doubt the timeliness of Diamond's notice, whether she could have provided notice earlier. For example, "food receipts in the city where your parents reside" say nothing about whether Diamond's mother had an FMLA-qualifying condition, but they do say where Diamond was. Thus, Hospice appears to have been attempting to verify whether Diamond was being truthful about caring for her parents. But, even assuming an employer could permissibly request additional documentation to verify an employee's absence about which it had doubts, nothing in the record suggests that Hospice had reason to doubt Diamond's veracity. Indeed, by April 2014, Diamond had been taking intermittent FMLA leave with Hospice's approval for nearly a year in order to take care of her parents.

Nor does the record disclose "any usual and customary notice and procedural requirements for requesting leave" that could support Hospice's request. For example, it is conceivable that if an employer required some form of documentation for any and all unforeseeable leave requests, it would be "usual and customary" for the employer to also request such documentation for unforeseeable FMLA leave.[6] But here, Hospice's purported documentation policy applied solely to unforeseeable FMLA leave, not leave requests generally. Additionally, when Diamond requested the HR document outlining this policy, Chennault simply

---

[6] We express no opinion about whether such a policy is consistent with the FMLA, as that issue is not presented here.

referred her to the FMLA regulations, which suggests that Hospice's policy may have been *ad hoc*. These facts could support an inference that Hospice, knowing it could not deny Diamond's leave requests outright, sought to discourage her from taking FMLA leave by making approval of her leave requests more difficult.

Finally, on this record, a jury could reasonably conclude that Diamond was prejudiced by the interference. *See Evans*, 762 F.3d at 1296. For example, if a jury believed Diamond's testimony that she would have taken more days off in April 2014 had Chennault not discouraged her from doing so, Diamond could prove that she sustained "monetary losses" "as a direct result of the violation," such as the cost of "traveling 300 miles each way to [her] parents' home" "despite the care recommended by [her] mother's MD for the entire month of April." *See* 29 U.S.C. § 2617(a)(1)(A)(i).

Because there is sufficient evidence for a reasonable jury to find that Hospice interfered with Diamond's FMLA rights and that she suffered damages as a result, we vacate the entry of summary judgment on Diamond's FMLA interference claim.

## B.    *Retaliation Claim*

To prove FMLA retaliation, the plaintiff must show that her employer intentionally discriminated against her for having exercised an FMLA right. *Martin*, 543 F.3d at 1267. In other words, the plaintiff must show that her

16

"employer's actions were motivated by an impermissible retaliatory or discriminatory animus."  *Id.* at 1267–68 (quoting *Strickland*, 239 F.3d at 1207 (internal quotation marks omitted)).

An employee may prove an FMLA retaliation claim through either direct or circumstantial evidence.  The parties dispute whether Diamond has produced direct evidence of discriminatory or retaliatory animus.  We decline to resolve this dispute because, even assuming Diamond's evidence is entirely circumstantial, she has presented more than enough circumstantial evidence to render summary judgment inappropriate.

In the absence of direct evidence of retaliation, we apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Id.* at 1268.  Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of retaliation, which consists of three elements: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment decision, and (3) the decision was causally related to the protected activity.  *Id.*  If the plaintiff makes out her *prima facie* case, the burden shifts to the employer to articulate a legitimate reason for the adverse action.  *Id.*  If the employer does so, the plaintiff must come forward with evidence sufficient for a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse action.  *Hurlbert v. St. Mary's Health Care Sys.,*

17

*Inc.*, 439 F.3d 1286, 1297–98 (11th Cir. 2006).

Here, Diamond easily established a *prima facie* case of FMLA retaliation. To begin with, Diamond's termination was sufficiently close in time to her FMLA leave to support an inference of causation. *See id.* at 1298 (stating that close temporal proximity between the protected conduct and the adverse action generally is generally sufficient to establish a causal connection). Construed in Diamond's favor, the evidence shows Hospice had no problem accommodating Diamond's FMLA leave until March 2014, when she took unforeseeable FMLA leave to care for her mother. From March 21 until April 21, Diamond took around thirteen days of FMLA leave, all on short notice. Then, two weeks after April 21, on May 5, she was fired. A jury could reasonably infer that Diamond's use of intermittent, unforeseeable leave in March and April 2014 was causally related to her termination in early May 2014. *See id.*

Moreover, Diamond's evidence of temporal proximity is strongly corroborated by other evidence showing a causal connection between her FMLA leave and her termination. Diamond began having more difficulty getting FMLA leave approved once Chennault took over HR Manager duties in March 2014. And Chennault subsequently made negative comments to Diamond about her use of FMLA leave. Specifically, Chennault notified Diamond on April 8 that her "continued unpaid time away from the workplace compromises the quality of care

we are able to provide as an organization," and then, on April 30, identified specific "examples of 'quality of care' suffering due to repeated 'emergent' leaves of absence." Five days later after the April 30 email, Hospice terminated Diamond's employment. Based on these facts, Diamond established a *prima facie* case.

As legitimate reasons for the adverse action, Hospice contends that it "terminated Ms. Diamond's employment for disregarding direct orders from her supervisor to complete the open care plans for hospice patients before leaving for the day and violating Survey guidelines by leaving the premises during a State Survey without notifying the Clinical Director." Because Diamond has not specifically rebutted these facts, Hospice argues, it is entitled to summary judgment. We are not persuaded.

Diamond has presented sufficient evidence of pretext. A reasonable jury could conclude that Hospice's proffered reasons were not what actually motived its conduct and that Diamond was discriminated against for having exercised her FMLA rights. *See Martin*, 543 F.3d at 1267; *Hurlbert*, 439 F.3d 1298.

Although Hospice attempts to focus on the two instances described above—Diamond's purported insubordination and her violation of Survey guidelines—a jury could reasonably conclude that, even if these events were undisputed, they were minor considerations that had little impact on the decision to terminate

19

Diamond's employment.  In the termination memo, these two instances do not appear in the lists of "offenses" (graded as "serious," "major," and "critical"), which, according to the memo, were "cause for disciplinary action," up to and including termination.  All of the alleged disciplinary offenses in the memo were "productivity related" deficiencies or "acts of misconduct" related to patient care. Furthermore, Diamond was never disciplined for her behavior on April 29, nor, for that matter, for any of the other alleged disciplinary offenses.  Moreover, at her deposition, Chennault, who wrote the termination memo, stated that the reason for Diamond's termination was poor job performance.  And Hospice concedes that the two instances it relies on did not alone support Diamond's dismissal, but rather now asserts that they were considered "in conjunction with her . . . poor job performance with respect to time management, completing care plans, and other required documentation."

Furthermore, Diamond presented evidence showing that Chennault negatively commented on her use of unforeseeable FMLA leave and directly connected her use of FMLA leave to deficiencies in the timeliness of her work documentation, which appear to be the focus of the termination memo.  Based on these comments, as well as the close proximity of the termination decision to Diamond's use of unforeseeable leave and Hospice's dubious requests for documentation of such leave, the record contains a genuine dispute of material fact

as to whether Hospice discriminated against Diamond for taking FMLA-protected leave in violation of the FMLA. *See Martin*, 543 F.3d at 1268 (finding a genuine issue of material fact where the employer's proffered reason was performance related, the employer warned the employee about the ramifications of taking FMLA leave, and the adverse action was in close proximity to the use of leave); *Strickland*, 239 F.3d at 1206.

## V.

For the reasons stated, we vacate the entry of summary judgment in favor of Hospice on Diamond's FMLA interference and retaliations claims, and we remand this case for trial.

**VACATED AND REMANDED.**