[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 17, 2006
THOMAS K. KAHN
CLERK

_____

No. 06-12220
Non-Argument Calendar
_____

D. C. Docket No. 05-00627-CV-5-IPJ

LAURA BEARD,

Plaintiff-Appellant,

versus

84 LUMBER COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(October 17, 2006)**

Before MARCUS, WILSON and KRAVITCH, Circuit Judges.

PER CURIAM:

Laura Beard appeals the district court's grant of summary judgment in favor

of her employer 84 Lumber Company in her Title VII suit alleging sexual

discrimination, constructive discharge, and retaliation, 42 U.S.C. §§ 2000e and 1981. After a review of the record, we affirm.

I. Background

Beard began working for 84 Lumber Company at the Huntsville, Alabama store in April 2003. 84 Lumber Company sells lumber and building materials to individuals and professional contractors, and this type of business is generally male-dominated. For the three years prior to her employment with 84 Lumber Company, Beard worked for Lowe's, where she had a reputation for building strong relationships with her customers. Beard was hired by 84 Lumber Company store manager Jim Hougas, who also hired four men as salespeople when the store opened. Two of the men - Robert Garrison, who had twenty-five years experience, and John Brooks, who had forty-one years experience - were hired as outside salespeople. Beard was hired as a contractor sales representative ("CSR"), but later was promoted to outside salesperson. The CSR sales staff would typically start with a base salary in addition to bonuses, with the base salary decreasing until the salesperson worked off commission based on the salesperson's gross profit. Outside sales staff were paid on straight commission, although they could negotiate a declining base salary for a period of twenty-four weeks. Hougas's evaluations and compensation depended on the sales numbers and gross profits

2

generated by his salespeople. As a CSR, Beard began employment with a declining base salary. When she expressed concern over financial difficulties, Beard received two salary guarantees from Hougas's superiors.

Each sales person was assigned a coordinator to assist with sales quotes, special orders, and delivery arrangement. Beard alleged that she was assigned numerous unqualified coordinators and was reassigned at least ten times, while male salespersons were assigned more qualified coordinators and rarely faced reassignment. Of the coordinators assigned to Beard, at least five were not hired as coordinators or had no experience. According to Hougas, the reassignment resulted from the need for Garrison, who was handling the bulk of the store's business, to have the most qualified coordinator. He also reassigned coordinators in an attempt to accommodate Beard's complaints.

Beard further alleged that (1) Brooks and Garrison worked off the guaranteed salary in addition to commission; (2) Hougas secretly gave Robert Garrison commissions based on accounts he never sold;[1] (3) Hougas permitted other salespeople to call on her accounts; and (4) Hougas permitted Garrison to sell at a lower profit margin on at least one account. Hougas explains that he gave Garrison permission to go after another account because the client wished to

---

[1] Beard claimed that Hougas assigned walk-in accounts to Garrison's sales sheets so that Garrison received credit for accounts he did not sell.

3

communicate through email, which Beard was unable to do, and because the account was inactive at the time. When Hougas informed Beard of the change, she agreed. Beard also concedes that inactive accounts were "fair game" among salespeople. She contends, however, that Hougas gave Garrison and Brooks support, but did not offer her support. Beard just believed this was because she was a woman.

Beard eventually learned that D.R. Horton was planning to build in the Huntsville area, and she pursued the project. Over the course of a year, she met weekly with people from Horton to obtain the contract. Although Horton executives were pleased with Beard's work and the level of service she gave, they questioned 84 Lumber Company's ability to handle the account because 84 Lumber Company was a new store that had not been open long. After discussing the concern with area manager Donnie Lemons, Hougas reassigned the account to Garrison before Horton actually made any purchases. Hougas considered having Garrison and Beard share the account, but Garrison was unwilling to share the account. Hougas stated that he reassigned the account because Garrison had significantly more experience, product knowledge, and skill to handle the account, and that he was concerned that Beard would be unable to follow through with the customer's needs. In her performance evaluations, Beard received good reports,

4

but was advised to increase her product knowledge. Hougas also noted that Beard was having problems with some accounts, which Beard acknowledged and attributed to her numerous coordinators. Beard concedes that Garrison had more experience and that she had never worked an account as large as Horton's. After the account was reassigned, Beard experienced her highest sales months since beginning her employment.

Beard never complained to anyone in the company, even though the president of the company was a woman. On June 8, 2004, Beard filed a complaint with the EEOC, alleging discrimination.[2] Hougas was aware of the charge and spoke with employees about filing complaints with anyone other than him. Beard alleges that after the complaint the company retaliated against her, although she could not point to specific instances of retaliation, other than difficulties with deliveries and billing. She believed, however, that all her problems were because she was a woman. She alleged that other salespeople did not have problems, and Hougas did nothing to resolve these problems. The other employees, however, stated in depositions that they experienced similar problems. Other than Hougas,

---

[2] Beard also complained that she was not given a phone when she first came to the store, that she was told to wear khakis while men could wear jeans, and she was moved from her office, although she acknowledges that she did not complain that these events occurred because she was a woman. In any event, these events occurred outside the 180-day period, and, therefore, we do not consider them as adverse employment actions. 42 U.S.C. § 2000e-5(e).

Beard could not identify anyone who knew of her EEOC complaint. In November 2004, after she filed her EEOC complaint, Beard requested and received another salary guarantee.

In February 2005, Beard resigned because she was not earning enough money and filed a second EEOC charge alleging discrimination and retaliation. She immediately began working for another sales company. Beard then filed the instant discrimination and retaliation complaint against 84 Lumber Company, alleging that she was discriminated against based on her sex, that male salespeople were treated more favorably, that she was retaliated against after she filed an EEOC charge concerning the discrimination, and that she was constructively terminated.

The court granted summary judgment, finding that although Beard was a member of a protected class, she could not show any adverse employment action or that similarly situated male employees were treated more favorably. The court determined that taking the Horton account away from Beard could constitute an employment action, but that Beard and Garrison were not similarly situated because Garrison had more experience and could do tasks that Beard was unable to do. The court further found that, even if the employees were similarly situated, Beard had not shown that the company's legitimate non-discriminatory reason for

6

reassigning the account was a pretext for discrimination, as her only evidence was that the industry in which she worked was male-dominated. The court also rejected Beard's argument that male salespeople were paid more, as the evidence showed that pay was structured based on the individual employee. The court noted that Beard was given several guarantees. Addressing the retaliation claim, the court found that there was no adverse employment action[3] and no causal link, as no one except Hougas was aware of the complaint and Beard could not identify specific instances of retaliation. Finally, the court rejected Beard's claim of constructive discharge, concluding that no reasonable person would have found the conditions "so intolerable" as to compel the employee to resign. The court noted that Beard received an additional pay guarantee after the Horton account was reassigned. Beard now appeals.

II. Discussion

Beard challenges the district court's factual and legal findings, arguing that (1) she and Garrison were similarly situated; (2) the competition for other accounts was an adverse action; (3) the court misunderstood her disparate pay argument, as Brooks had a salary not just a guarantee; (4) based on the collective actions, she

---

[3] Although the court erroneously found that only an "ultimate employment decision" qualified as an adverse action, we do not reverse the court's decision, as the record supports the court's conclusion that there was no causal link.

7

suffered an adverse action; (5) the court erred in finding that she was not constructively discharged, as Hougas routinely undermined her ability to make sales; (6) the court shifted the burden of production on the company's legitimate non-discriminatory reasons for its conduct and the company failed to rebut Beard's claim of disparate pay; (7) she established pretext based on circumstantial evidence, and was not required to identify statements showing discriminatory intent; (8) the court failed to consider the evidence in the light most favorable to Beard, finding that two pay guarantees refuted any discrimination claims and that the evidence showed, at most, favoritism toward Brooks and Garrison; and (9) she established a causal connection between the retaliatory conduct and her EEOC complaint.

We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the party opposing the motion. Skrtich v. Thorton, 280 F.3d 1295, 1299 (11th Cir. 2002). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Eberhardt v. Waters, 901 F.2d 1578, 1580 (11th Cir. 1990). Once the party seeking summary judgment meets its burden of

8

showing the absence of a genuine issue of material fact, the burden shifts to the non-moving party to submit sufficient evidence to rebut the showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).

A. Discrimination

Title VII prohibits discrimination of the basis of gender. 42 U.S.C. § 2000e; McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973). Beard may prove her case using either direct or circumstantial evidence. Id. To establish a prima facie case of racial discrimination based on circumstantial evidence, Beard must show that she was a qualified member of a protected class and was subjected to an adverse action in contrast with similarly situated employees outside the protected class. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004). An adverse action is one which results in "a serious and material change in the terms, conditions, or privileges of employment . . . as viewed by a reasonable person in the circumstances."[4] Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th

---

[4] We note that the Supreme Court recently addressed the types of actions that qualify as adverse employment actions under the anti-retaliation provisions of Title VII. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. —, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). The Court did not discuss how this definition would apply to the anti-discrimination standards. We need not address this question here because we conclude that Beard suffered an adverse action under either definition.

Cir. 2001).

Here, the parties do not dispute that Beard was a qualified member of a protected class. Viewing the evidence in the light most favorable to Beard, she suffered an adverse action when Hougas reassigned the Horton account.[5] Nevertheless, she cannot show that she and Garrison were similarly situated.

Beard concedes that Garrison had more experience. In fact, Garrison had over twenty-five years experience; Beard had a little over three years experience. Thus, the two were not similarly situated in all relevant aspects. See Jackson v. Bellsouth Telecomm., 372 F.3d 1250, 1273 (11th Cir. 2004) (explaining that "[w]hen comparing similarly situated individuals to raise an inference of discriminatory motivation, the individuals must be similarly situated in all relevant respects besides [gender], since different treatment of *dissimilarly* situated persons does not violate civil rights laws.").

Even if we were to conclude that Beard established a prima facie case, summary judgment is appropriate because Beard cannot show that 84 Lumber

[5] Because we conclude that there was an adverse action, we need not consider whether Hougas's conduct, viewing collectively, qualified as an adverse action. Even if we were to consider the other allegations, Beard cannot show that 84 Lumber Company's actions were a pretext for discrimination. For example, Beard challenges the decision to give another account to another salesman. As she admits, however, dormant accounts were "fair game," and the account in question had produced no sales in recent months. She also complains of the frequent and numerous changes in coordinators. The evidence shows, however, that the changes were due, in part, to Beard's own complaints about the coordinator assigned to her, and that the changes were made in an effort to please her.

Company's legitimate non-discriminatory reason for reassigning the account was a pretext for discrimination. Once the plaintiff establishes the prima facie case, the burden of production shifts to the employer to show a legitimate, non-discriminatory reason for the employer's actions. The plaintiff then must show that the employer's reason was a pretext for discrimination. McDonnell Douglas, 411 U.S. at 802-04, 807.

> In order to show pretext, the plaintiff must
>
> demonstrate that the proffered reason was not the true reason for the employment decision . . . . [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

Jackson v. Alabama State Tenure Committee, 405 F.3d 1276, 1289 (11th Cir. 2005) (citation omitted). The court should evaluate whether the plaintiff demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997). A subjective reason for the employer's action can be as legitimate as any other reason, and an employee cannot substitute his business judgment for that of his employer. Chapman v. AI Transport, 229 F.3d 1012, 1030, 1033 (11th Cir. 2000) (en banc). "Conclusory

11

allegations of discrimination, without more, are not sufficient to raise an inference of pretext . . . ." Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 97 F.3d 436, 444 (11th Cir. 1996).

Horton had expressed concern over 84 Lumber Company's ability to handle its account. Thus, even though Horton was satisfied with Beard's performance, Hougas made a business decision to reassign the account to someone with more experience. Hougas explained that he made the change because of Garrison's experience and due to problems Beard had with coordinators and communication. After reviewing the record, we cannot conclude that this reason lacks plausibility, and we will not second-guess the employer's decision. Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991). Beard's conclusory allegations that this was evidence of pretext are insufficient to meet her burden. Accordingly, summary judgment was proper on this claim.

B. Pay

"To state a prima facie case of intentional discrimination in compensation, a plaintiff must establish that (1) she belongs to a [protected class]; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage." Cooper v. Southern Co., 390 F.3d 695, 735 (11th Cir. 2004).

12

Here, there is no merit to Beard's claims. As Beard herself admitted, she had no actual knowledge of the salary terms other employees were given. Her claims were based solely on hearsay. Moreover, she was unable to identify any similarly situated employee; she pointed to the salary she believed Brooks and Garrison received, but she had no evidence to support her claim. And as discussed above, Beard was not similarly situated to Garrison. Nor was she similarly situated to Brooks, who had worked in the industry for more than forty-one years. Both Brooks and Garrison had sales that exceeded Beard's. Additionally, Beard identified the time period for this discriminatory conduct as shortly after they began work. According to the record, outside sales staff worked on a declining salary for up to twenty-four weeks, but salespeople had the opportunity to negotiate for the terms of compensation. Furthermore, each time Beard requested financial assistance, she received a guaranteed salary. Given the different levels of experience, the difference in sales performance, and the different job classifications, Beard has not shown that she was similarly situated with Brooks and Garrison. Accordingly, summary judgment was proper on this claim.

C. Retaliation

Under Title VII, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because . . . [s]he has

made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Because Beard alleges a retaliation claim based on circumstantial evidence, the burden shifting framework in <u>McDonnell Douglas Corp.</u> applies. <u>Hulbert v. St. Mary's Health Care System, Inc.</u>, 439 F.3d 1286, 1297 (11th Cir. 2006).

To establish a prima facie case of retaliation, the plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she was subjected to retaliatory action by her employer;[6] and (3) there is a causal connection between the protected activity and the alleged retaliatory action. <u>See id.</u> If the plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate a legitimate reason for the adverse action. <u>Id.</u> If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual. <u>Id.</u>

To satisfy the causal connection requirement, Beard must establish that the protected activity and the alleged retaliatory action are not completely unrelated.

---

[6] The Supreme Court recently addressed this element of a retaliation claim in <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. —, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). The Court rejected the standards applied in this circuit, holding that "the scope of [Title VII's] anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm" and therefore, "is not limited to discriminatory actions that affect the terms and conditions of employment." <u>Id.</u> at 2412-14. Accordingly, a plaintiff need not show that she suffered an "adverse *employment* action" affecting the terms and conditions of employment (which was this circuit's pre-<u>Burlington Northern</u> retaliatory act standard), but must show that her employer subjected her to actions "a reasonable employee would have found materially adverse." <u>Id.</u> at 2414.

14

<u>Wideman v. Wal-Mart Stores, Inc.</u>, 141 F.3d 1453, 1457 (11th Cir. 1998).

Notably, the person engaged in the alleged conduct must be aware of the protected

activity. <u>Gupta v. Florida Bd. of Regents</u>, 212 F.3d 571, 590 (11th Cir. 2000).

Here, it is undisputed that Beard engaged in a protected activity. Although

the court incorrectly determined that only the ultimate adverse action was

sufficient to meet this prong,[7] Beard's claim still fails; Beard cannot show the

causal connection between her protected activity and any alleged retaliatory

conduct. The evidence showed that only Hougas was aware of the EEOC

complaint. And Beard herself concedes that there was no change in circumstances

after she filed the complaint; things were "equally bad." Moreover, other

salespeople experienced trouble with delivery and billing services. In light of these

facts, Beard failed to establish a prima facie case of retaliation.

D. Constructive Discharge

A constructive discharge occurs when a discriminatory employer imposes

working conditions that are "so intolerable that a reasonable person in [the

employee's] position would have been compelled to resign." <u>Fitz v. Pugmire</u>

<u>Lincoln-Mercury, Inc.</u>, 348 F.3d 974, 977 (11th Cir. 2003) (citing <u>Poole v. Country</u>

<u>Club of Columbus, Inc.</u>, 129 F.3d 551, 553 (11th Cir.1997)).

---

[7] We acknowledge that the court applied the wrong standard. Nevertheless, summary judgment was proper for the reasons stated above.

15

Here, the court correctly found that Beard's circumstances would not have compelled a reasonable person to resign. There is no evidence that Hougas routinely undermined Beard's ability to make sales. Rather, the evidence showed that, even after Hougas gave the Horton account to Garrison, Beard had her two highest sales months with the company.

Moreover, several employees experienced trouble with deliveries and billing, and this was not limited to Beard's accounts. Furthermore, when Beard expressed concern over her financial situation, she was given pay guarantees.[8] Under these conditions, a reasonable juror would not find the conditions so intolerable as to compel resignation.

III. Conclusion

For the foregoing reasons, we AFFIRM the district court.

---

[8] We also note that Beard signed an employment agreement with Garland Wholesale days before she tendered her resignation at 84 Lumber Company. This undermines her claim that she was forced to resign.

16