CLAY D. LAND, CHIEF U.S. DISTRICT COURT JUDGE
*1370 Plaintiff Sheila Firster is a former employee of Defendant Athens Heart Center, P.C. ("the Center"). During her employment, Firster's supervisor Annette Kelly used the Center's computer network to access Firster's medical records without her permission. After Firster complained about the incident, the Center terminated Firster. Firster claims that such conduct violates the Americans with Disabilities Act ("ADA"), 28 U.S.C. § 12101 et seq. and the Georgia Computer Systems Protection Act, O.C.G.A. § 16-9-91 et seq. Pending before the Court are the Center's motion for summary judgment and Firster's motion for partial summary judgment. The Court finds that genuine issues of fact preclude summary judgment in favor of either party. Accordingly, the Court denies the motions for summary judgment (ECF No. 9) and partial summary judgment (ECF No. 16).
The Center also moves to strike certain paragraphs of declarations offered by Firster in support of her motion for partial summary judgment. To the extent that the declarations contain hearsay that could not be reduced to admissible form at trial, see Jones v. UPS Ground Freight , 683 F.3d 1283, 1293-94 (11th Cir. 2012), the Court does not consider this evidence to determine the pending motions. But as noted below, most of this evidence could likely be reduced to admissible form. Thus, the Court denies the Center's motion to strike (ECF No. 19).
SUMMARY JUDGMENT STANDARD
Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine dispute of material fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it is relevant or necessary to the outcome of the suit. Id. at 248, 106 S.Ct. 2505. A factual dispute is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. Id.
FACTUAL BACKGROUND[1]
I. Firster's Employment at the Center
Firster began work as a medical assistant at the Center in September 2013. During the time relevant to Firster's claims, the Center operated four health care practices-two in Athens, one in Danielsville, and one in Lavonia. Agrawal Dep. 17:2-24, ECF No. 12. Firster initially worked at the flagship location, the Athens Heart Center.[2] As a medical assistant, Firster was responsible for taking patient vital *1371 signs, recording patient medical histories, presenting patients to physicians, and recording information relayed by physicians after appointments. Id. at 25:1-26:2, 28:2-18.
At the Athens Heart Center, Firster was supervised by Annette Kelly. Pl. Dep. 21:12-21, ECF No. 14. Kelly oversaw and disciplined the medical assistants and front desk personnel. Dobbs Dep. 17:2-4, ECF No. 13; Kelly Dep. 13:10-17, 15:1-22, ECF No. 15. Kelly never disciplined or had any problems with Firster when the two worked together at the Athens Heart Center. Pl. Dep. 21:19-21. Eventually, Kelly moved from the Athens Heart Center to the Danielsville Family Practice. Id. at 19:22-24.
In January 2015, after Kelly moved to Danielsville, the Center's administrator Dawn Dobbs evaluated Firster and gave her a written disciplinary warning. Def.'s Mot. for Summ. J. Ex. D, Performance Evaluation, ECF No. 9-7. Dobbs felt that Firster's performance had declined due to frequent absenteeism, involvement in "negative situations," and spending time on social media websites during work hours. Id. Dobbs spoke to Firster about these issues and Firster expressed a desire to improve. Id. Dobbs agreed to give Firster that opportunity, monitor her improvement, and reevaluate her in thirty days. Id. Firster testified that when Dobbs reevaluated her, Dobbs told Firster that she had improved. Pl. Dep. 25:12-26:10.
In March 2015, Firster requested and received a transfer from the Athens Heart Center to the Danielsville Family Practice. Dobbs Dep. 32:18-33:21. Firster saw the transfer as a way to learn new skills and shorten her commute. Id. at 33:18-21; Pl. Dep. 21:4. The Center offers evidence that Firster was also having problems getting along with one of the other employees at the Athens Heart Center. Dobbs Dep. 33:1-6.
When Firster moved to the Danielsville Family Practice, Kelly again became her supervisor.[3] In April and May of 2015, Firster received Kelly's permission to take time off work on about six occasions. The Center offers evidence that Firster was absent on April 16 for a dentist appointment with her children, left early on May 4 and 10 due to a sick child, asked for May 13 off for a dentist appointment, did not return after lunch on May 19 because she was sick, and asked off for "something with her daughter" on May 21. Dobbs Dep. 90:7-15.
Kelly testified that she reminded Firster that when she was out of work it made things harder on the other employees at the clinic. Kelly Dep. 57:25-58:4. Kelly testified that when Firster "was at work and her mind was at work, she did an excellent job, but then if she had other things on her mind, she didn't do the job to the best of her abilities, whether it be moving at a slower pace or just not being on her game." Id. at 57:14-19. Kelly knew that Firster was struggling with personal health concerns. Id. at 59:5-21. She also knew that Firster had seen doctors at the Athens Heart Center and the Danielsville *1372 Family Practice as a patient. Agrawal Dep. 40:11-15; Pl. Dep. 30:20-22. Kelly gave Firster the general "pep talk" that she gave to all medical assistants about "picking up the pace" and "pulling [her] load." Kelly Dep. 58:5-10. But Kelly never formerly disciplined Firster or expressed concerns to Firster about whether Firster could continue working. Id. at 58:11-16.
II. The June 2015 Incident
In the middle of the night on June 7, 2015, Firster was admitted to Athens Regional Medical Center ("Athens Regional") due to a serious medical condition. Pl.'s Mot. for Partial Summ. J. Ex. F, Pl. Decl. I ¶ 6, ECF No. 16-8. Firster knew that her coworkers at the Center had access to Athens Regional's medical records. Id. ¶ 7. When she arrived at the hospital on June 7, Firster asked Athens Regional to seal her records because she did not want her coworkers to be able to access them. Id. Staff at Athens Regional assured Firster that it would add a privacy note to her file. Id. ¶ 8.[4] Athens Regional entered Firster into the system as a "No Information" patient. Pl.'s Mot. for Partial Summ. J. Ex. E, Prince Decl. ¶ 7, ECF No. 16-7. "That means that the patient does not want any information to be given out about her to anyone and a privacy note is added to her file." Id.
At 5:19 A.M. the morning after she was admitted, Firster texted Kelly and told her that she had been admitted to the hospital. Pl.'s Mot. for Partial Summ. J. Ex. D, Firster/Kelly Texts, ECF No. 16-6. Kelly asked Firster why she was admitted and Firster replied, "It's complicated." Id. Kelly said, "Umm..ok." Id.
Kelly was one of the Center employees with access to hospital medical records. As part of Kelly's employment, Kelly signed a Confidentiality Statement promising not to access medical records "unless it relate[d] directly to [her] job duties." Pl.'s Mot. for Partial Summ. J. Ex. K, Confidentiality Statement, ECF No. 16-13. After learning about Firster's hospitalization, Kelly accessed the Athens Regional medical records system and viewed Firster's medical records.[5] Kelly Dep. 25:19-26:13. Kelly did not use her own login to view the records. She used the login of Dr. Subodh Agrawal, the Center's founder and CEO. Kelly was not authorized to use Dr. Agrawal's login without permission. Agrawal Dep. 53:17-21; accord Dobbs Dep. 66:1-15 (stating that Kelly was supposed to use her own login). It is unclear if Kelly could have accessed the records with her own login or if she even had one.
The Center offers evidence that Kelly's conduct was standard practice-when a Center employee learned that a Center patient had been admitted to the hospital, the employee would pull the patient's hospital records and put them in the patient's chart. See Kelly Dep. 34:16-24. Firster *1373 agrees that the Center tried to update patients' charts with hospital records. But Firster states that updating patient charts before the patient came in for an appointment was atypical due to time constraints. Pl. Dep. 36:6-13. Regardless of the Center's standard practice, Kelly did not put Firster's medical records in her chart on June 8. Kelly states that she accessed the records intending to update Firster's chart but decided not to when she saw the sensitivity of Firster's medical condition. Kelly Dep. 25:22-25, 32:2-16.
Firster suspected that Kelly would try to find out why she was admitted by accessing her Athens Regional medical records. Pl. Decl. I ¶ 12. Firster called Athens Regional's privacy department to see if anyone from the Center had viewed her records. Id. ¶ 13; Prince Decl. ¶ 8.[6] Firster spoke with Athens Regional's privacy director, Melissa Prince. Pl. Decl. I ¶ 13. Prince told Firster that the Center's login and password had been used to access her medical records on the morning of June 8, 2015. Id. ; Prince Decl. ¶ 9. Prince noted that the person who had accessed Firster's medical records had not only accessed the records for the June 7 admission but also viewed several other sections of Firster's medical records. Prince Decl. ¶ 11. Prince confirmed that Firster's file had a privacy note, "which means that the person accessing the records would have seen the note and understood that access to the records was unauthorized." Id. ¶ 10.[7] The Center offers evidence that Center employees were not trained on the meaning of the "No Information" designation in the Athens Regional system. Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. Ex. C, Dobbs Decl. ¶¶ 3-5, ECF No. 18-3. And Kelly states that she did not know the significance of the designation. Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. Ex. B, Kelly Decl. ¶ 10, ECF No. 18-2.
III. The Center's Investigation and Firster's Termination
After speaking with Prince, Firster told Center administrator Dobbs that someone at the Center viewed her medical records. Pl. Decl. I ¶ 15. Dobbs said that she would look into it. Id. ; Dobbs Dep. 44:7-17. On June 9, 2015, Dobbs asked Kelly if she had accessed Firster's medical records; Kelly said no, which was untrue. Dobbs Dep. 62:6-12; Kelly Dep. 38:21-39:1-6. The Center offers evidence that Firster missed at least two days of work over the next two weeks. Dobbs Dep. 91:1-2.
On June 24, 2015, Kelly sent Dobbs a letter admitting that she accessed Firster's medical records. Pl.'s Mot. for Partial Summ. J. Ex. I, Letter from Annette Kelly to Dawn Dobbs (June 24, 2015), ECF No. 16-11. The Center offered to transfer Firster back to Athens so that she would not have to work with Kelly in Danielsville. Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts Ex. B, Pl. Decl. II
*1374 ¶ 6, ECF No. 17-9. Firster declined because the transfer would have lengthened her commute and created a hardship regarding her childcare arrangements. Id. ¶ 7. There is conflicting evidence regarding whether the Center took other steps to resolve the situation and how cooperative Firster was with these efforts. Compare Agrawal Dep. 66:14-17; 80:11-16 (stating that Firster threatened to sue the Center if it did not terminate Kelly and would not follow through with meetings to resolve the situation), with Pl. Decl. II ¶¶ 9-10 (stating that she never demanded that Kelly was terminated and never refused to work with Kelly or the Center to resolve the situation). There is also conflicting evidence regarding whether Firster left work on June 24-the day that Kelly admitted to accessing her medical records. Compare Dobbs Dep. 91:7-10 (stating that Firster left work and was sitting in her car), with Pl. Decl. II ¶ 18 (stating that she ate lunch in her car but was otherwise at work). On June 25, 2015, Firster was not at work. Pl. Decl. II ¶ 19; Dobbs Dep. 124:19-21.
On June 26, 2015, the Center sent Firster an email, terminating her employment due to Firster's "attitude toward [he]r work." Pl.'s Mot. for Partial Summ. J. Ex. G, Email from Dawn Dobbs to Sheila Firster (June 26, 2015), ECF No. 16-9. The email notes that Firster had told Dobbs and Agrawal that she "fe[lt] like [he]r privacy ha[d] been violated" and that she was "not comfortable in the Danielsville office." Id. A few weeks after Firster's termination, the Center filed a form regarding the reason for Firster's discharge with the Georgia Department of Labor. It listed the reason for her discharge as follows: "Employee did not want to work in our Danielsville office until she resolved and [sic] issue w/ a co-worker." Pl.'s Mot. for Partial Summ. J. Ex. H, Employer's Information on Discharge 1, ECF No. 16-10 ("GDOL Filing").
The Center eventually reprimanded Kelly for using Dr. Agrawal's login without permission. Dobbs Dep. 66:1-15. The reprimand stated that Kelly "admitted that [she] ha[d] used [he]r Login privilege inappropriately." Pl.'s Mot. for Partial Summ. J. Ex. L, Letter from Dawn Dobbs to Annette Kelly (July 10, 2015), ECF No. 16-14. The letter instructed Kelly not to access the hospital records system using any user login. Id. Such conduct would result in Kelly's immediate termination. Id.
IV. Firster's Claims
Based on the above facts, Firster asserts the following claims against the Center: (1) an ADA unlawful inquiry claim based on Kelly asking her why she was admitted to Athens Regional and accessing her medical records; (2) an ADA retaliation claim based on her termination; and (3) a claim for computer invasion of privacy under the Georgia Computer Systems Protection Act.
DISCUSSION
I. ADA Claims
A. Unlawful Inquiry
Firster claims that Kelly violated the ADA by asking her why she was admitted to the hospital and accessing her medical records. Both parties seek summary judgment on this claim. The Court finds that neither party is entitled to summary judgment.
Under the ADA:
A covered entity ... shall not make inquiries of an employee as to whether such employee is an individual with a *1375 disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.
42 U.S.C. § 12112(d)(4)(A). There is little case law regarding what constitutes a "disability-related inquiry" under this provision. See Conroy v. N.Y. State Dep't of Corr. Servs. , 333 F.3d 88, 93 (2d Cir. 2003) (noting that relatively few courts have addressed the medical inquiries provision of the ADA). But the EEOC instructs that "[a] 'disability-related inquiry' is a question that is likely to elicit information about a disability." Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA), 2000 WL 33407183, *1 (EEOC, July 26, 2000). And at least one circuit has found that requiring an employee to provide a doctor's note with a general medical diagnosis is a disability-related inquiry. Conroy , 333 F.3d at 95 (applying a liberal "may tend to reveal a disability" standard). But see Lee v. City of Columbus , 636 F.3d 245, 253-59 (6th Cir. 2011) (holding that the city's policy requiring employees to disclose the nature of their illness when returning from sick leave did not violate the Rehabilitation Act and criticizing Conroy ).
Here, Kelly did not merely ask Firster for a general diagnosis. Rather, Kelly also accessed Firster's medical records without Firster's consent. Firster's medical records may have revealed details about Firster's condition that an employee could omit when providing a general diagnosis to an employer. And Kelly admits that when she saw Firster's records, she realized the sensitivity of the information. Kelly Dep. 32:2-16. Given the detailed, sensitive nature of medical records, a reasonable juror could conclude that Kelly made a disability-related inquiry covered by § 12112(d)(4)(A). See Doe v. Kohn Nast & Graf, P.C. , 866 F.Supp. 190, 197 (E.D. Pa. 1994) (holding that the plaintiff stated a claim for unlawful medical inquiry where the plaintiff alleged that his employer became suspicious about his medical condition, searched the plaintiff's office, and found the plaintiff's medical records).
The Center argues that Kelly's inquiry is not covered by this provision because Kelly accessed the records as a medical provider, intending to put the records in Firster's chart. But the Center cites no authority for its claim that medical employers are exempt from parts of the ADA if their employees are also patients. Additionally, there is conflicting evidence regarding why Kelly accessed Firster's records. The Center offers evidence that pulling patients' hospital records to put them in patients' charts was the Center's standard procedure. Kelly Dep. 34:16-21. And Kelly testified that she accessed Firster's medical records for that purpose. Id. at 25:22-25. But Firster testified that pulling a patient's hospital records before the patient arrived for an appointment was atypical. Pl. Dep. 36:6-13. And it is undisputed that Kelly did not put Firster's medical records in her chart. Thus, there are genuine disputes of fact regarding whether Kelly made a disability-related inquiry.
The Center also argues that even if Kelly's inquiry is covered by the Act, it is entitled to summary judgment because the inquiry was job-related and consistent with a business necessity. An inquiry may be "job-related and consistent with a business necessity" if the employer has objective evidence that the employee's ability to perform an essential job function may be impaired by a medical condition. See *1376 Owusu-Ansah v. Coca-Cola Co. , 715 F.3d 1306, 1312-13 (11th Cir. 2013). The Center claims that Kelly made the inquiry to determine if and when Firster would be able to return to work. Physical presence at work may be an essential job function. See Abram v. Fulton Cty. Gov't , 598 Fed.Appx. 672, 677 (11th Cir. 2015) (per curiam) (holding that physical presence at the front desk was an essential function of the plaintiff's job as an administrative coordinator). But there are factual disputes regarding whether Kelly's inquiry was for this job-related purpose.
First, there are factual disputes regarding whether Kelly had objective reasons to believe that Firster would be frequently absent due to her medical condition. The Center presents evidence that Firster missed several days of work in April and May 2015. But it is unclear whether any of these were related to Firster's medical condition. Moreover, there is evidence that Kelly's inquiry was broader and more intrusive than necessary to determine when Firster would be back at work. See Conroy , 333 F.3d at 98 (placing the burden on the employer to "show that the inquiry ... is no broader or more intrusive than necessary"). It is undisputed that Kelly not only looked at Firster's records for June 7 but also examined several other sections of Firster's medical records. And it is unclear why Kelly did not just ask Firster when she thought she would be back at work. Given the disputes of fact regarding whether Kelly's inquiry was disability-related and/or consistent with a business necessity, the Court denies both parties' motions for summary judgment on this claim.
B. Unlawful Retaliation
Firster also claims that the Center terminated her for complaining about Kelly's alleged violation of the ADA. Only the Center seeks summary judgment on this claim. As discussed below, the Center is not entitled to summary judgment.
The ADA makes it unlawful for an employer to retaliate against an individual because that individual opposed an act or practice that violates the ADA. 42 U.S.C. § 12203(a). The Court evaluates Firster's retaliation claim under the burden shifting framework of McDonnell Douglas Corp. v. Green , 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Farley v. Nationwide Mut. Ins. Co. , 197 F.3d 1322, 1336 (11th Cir. 1999) (reviewing ADA retaliation claim "under the same rubric used for Title VII retaliation claims"); Goldsmith v. City of Atmore , 996 F.2d 1155, 1162-63 (11th Cir. 1993) (noting that McDonnell Douglas framework controls Title VII retaliation claim). Under this framework, Firster must establish a prima facie case by showing that: (1) she "engaged in statutorily protected conduct;" (2) she "suffered an adverse employment action;" and (3) "the adverse action was causally related to the protected expression." Farley , 197 F.3d at 1336. If Firster establishes a prima facie case, then the Center must articulate a legitimate reason for the adverse action. Id. Firster has the ultimate burden to show that the proffered legitimate reason is "a pretextual ruse designed to mask retaliation." Id. (quoting Stewart v. Happy Herman's Cheshire Bridge, Inc. , 117 F.3d 1278, 1287 (11th Cir. 1997) ).
Firster has established a prima facie case. Firster offers evidence that she engaged in statutorily protected conduct when she complained to Dobbs about Kelly accessing her medical records. And it is undisputed that Firster's termination is an *1377 adverse employment action.[8] Regarding causation, Firster points to the fact that she was terminated within three weeks of complaining about someone accessing her medical records. "Close temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.' " Hurlbert v. St. Mary's Health Care Sys., Inc. , 439 F.3d 1286, 1298 (11th Cir. 2006) (quoting Brungart v. BellSouth Telecomms., Inc. , 231 F.3d 791, 799 (11th Cir. 2000) ). Additionally, Firster's termination email discussed the situation with Kelly, see Email from Dawn Dobbs to Sheila Firster (June 26, 2015), indicating that the termination and the situation with Kelly were related. See Farley , 197 F.3d at 1337 ("To prove a causal connection, we require a plaintiff only to demonstrate 'that the protected activity and the adverse action were not wholly unrelated. ' " (quoting Clover v. Total Sys. Servs. , 176 F.3d 1346, 1354 (11th Cir. 1999) )).
The Center now seeks to separate Firster's termination from the situation with Kelly by claiming that its legitimate reason for terminating Firster was her frequent absenteeism. But the fact that the Center did not mention this reason in Firster's termination email or its filing with the Georgia Department of Labor is evidence that this reason is pretextual. See Hurlbert , 439 F.3d at 1298 ("We have recognized that an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext."). And a reasonable jury could find the Center's evidence that Firster's absenteeism was an ongoing problem to be weak and implausible. Aside from the January 2015 evaluation eight months before Firster's termination, Firster was never disciplined for absenteeism or any other problems. Based on this evidence, a reasonable juror could conclude that the Center terminated Firster because she complained about Kelly accessing her medical records, not frequent absenteeism. Accordingly, the Court denies the Center's motion for summary judgment on this claim.
II. Computer Invasion of Privacy
Finally, Firster claims that Kelly violated the Georgia Computer Systems Protection Act by accessing Firster's medical records without her permission. Both Firster and the Center seek summary judgment on this claim. Again, the Court finds that neither party is entitled to summary judgment.
Under O.C.G.A. § 16-9-93(c) :
Any person who uses a computer or computer network with the intention of examining any employment, medical, salary, credit, or any other financial or personal data relating to any other person with knowledge that such examination is without authority shall be guilty of the crime of computer invasion of privacy.
For purposes of this provision, " '[w]ithout authority' includes the use of a computer *1378 or computer network in a manner that exceeds any right or permission granted by the owner of the computer or computer network." O.C.G.A. § 16-9-92(18). A party may sue for damages for a violation of O.C.G.A. § 16-9-93(c). O.C.G.A. § 16-9-93(g)(1).
Here, it is undisputed that Kelly used a computer and computer network to view Firster's personal medical data. But there are factual disputes regarding whether Kelly did so "with knowledge that such examination [wa]s without authority." Kelly testified that she intended to pull Firster's medical records for her chart and did not realize that she was doing anything wrong. But when Dobbs first asked Kelly whether she had accessed Firster's records, Kelly lied about it, indicating that Kelly knew that she should not have accessed the records. And Kelly used Dr. Agrawal's login and password to access the records, something that both of her supervisors testified that she was unauthorized to do. See Dobbs Dep. 66:1-15; Agrawal Dep. 53:17-21. Additionally, Athens Regional's privacy director testified that when Kelly looked at Firster's file it would have had a privacy notice on it. Prince Decl. ¶ 7. There are issues of fact regarding whether Kelly could have inferred from the note that the records were sealed. Finally, as part of her employment, Kelly signed a Confidentiality Statement informing her that she could not access patient medical records unless it was directly related to her job duties. See Confidentiality Statement. And there are disputes of fact regarding whether Kelly's access of the records was consistent with her job duties.
The Center also argues that, to the extent that Kelly did not lawfully access Firster's medical records, it cannot be held responsible for her conduct under the theory of respondeat superior. Under Georgia law, the Center can be held liable for Kelly's conduct if: (1) Kelly acted in furtherance of the Center's business and (2) Kelly acted within the scope of the Center's business when she accessed the medical records. See Piedmont Hosp., Inc. v. Palladino , 276 Ga. 612, 580 S.E.2d 215, 218 (2003). Given the factual disputes that exist as to why Kelly accessed the medical records and whether she was within the scope of her employment when she did so, the Center's argument that it is entitled to judgment as a matter of law is unpersuasive. Accordingly, the Court denies both parties' motions for summary judgment on this claim.
CONCLUSION
As discussed above, genuine issues of material fact preclude summary judgment in favor of either party. Accordingly, the Court denies the Center's motion for summary judgment (ECF No. 9) and Firster's motion for partial summary judgment (ECF No. 16). The Court also denies the Center's motion to strike (ECF No. 19)
IT IS SO ORDERED, this 23rd day of May, 2017.

The Court construed the facts in the light most favorable to the non-moving party to determine Firster's motion for partial summary judgment and the Center's motion for summary judgment.

The Court will refer to Defendant as "the Center" and Defendant's main Athens location as "the Athens Heart Center" or "the Athens office."

The Center claims that Kelly had a conversation with Firster about what was expected of her at the Danielsville practice, warning Firster not to bring any "negativity" from Athens to Danielsville. Def.'s Statement of Undisputed Material Facts ¶ 23, ECF No. 9-2. The Center cites "Exhibit 15 to Dobbs Dep." for this proposition, but it is unclear where this exhibit is located in the record. Thus, the Court does not consider this fact to determine the Center's motion for summary judgment. Regardless, whether Kelly had this conversation with Firster is not material to the pending motions.

The Center moves to strike paragraph 8 of Firster's declaration, claiming that it is inadmissible hearsay of an unknown person at Athens Regional. But Firster would be able to testify at trial as to what she understood the situation to be regarding her medical records. Thus, the Court may consider evidence showing that Firster believed that her medical records were sealed. Regardless, this fact is not material to determine the present motions.

Although Kelly's access of Firster's medical records appears to have been after Kelly asked Firster why she was admitted to the hospital, there is evidence that it was before Firster replied, "It's complicated." See Prince Decl. ¶ 9 (stating the someone accessed Firster's medical records at 8:00 A.M. on June 8); Firster/Kelly Texts (showing Firster's reply at 9:07 A.M.).

The Center moves to strike paragraphs 13 and 14 of Firster's declaration as inadmissible hearsay. But this evidence would be admissible at trial through the direct testimony of Prince, whose declaration Firster also filed. Thus, the Court considers this evidence.

The Center objects to paragraph ten of Prince's declaration, claiming that it is impermissible lay opinion testimony that requires Prince to speculate regarding what Kelly would have understood. But the Court finds that Prince, as Athens Regional's privacy director, likely has a sufficient basis to offer an opinion of what the privacy note conveys. See Fed. R. of Evid. 701. Regardless, the Court's consideration of this fact does not change the outcome of the present motions.

Firster also claims that she suffered an "adverse employment action" when the Center offered to transfer her back to Athens because she would have had a longer commute to the Athens office. But the Court finds that a longer commute does not constitute "a serious and material change in the terms, conditions, or privileges of employment." See Barrow v. Georgia Pac. Corp. , 144 Fed.Appx. 54, 59 (11th Cir. 2005) (quoting Davis v. Town of Lake Park , 245 F.3d 1232, 1239 (11th Cir. 2001) ) (finding that the plaintiff's transfer to a position with similar job duties and responsibilities was not an adverse employment action).